UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

J.N

JUL 17 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. |
| v. ) | |
| ) | Judge Morton Denlow |
| SUN LEE ) | |
| a/k/a Han Dong Park ) | |
| ) | **08 CR 564** |

## AFFIDAVIT IN REMOVAL PROCEEDINGS

The undersigned Affiant personally appeared before Morton Denlow, a United States

Magistrate Judge, and being duly sworn on oath, states: that in the Eastern District of Virginia, SUN

LEE a/k/a Han Dong Park, was charged in a criminal complaint with a violation of Title 18, United

States Code, Sections 371 and 1543, and that on the basis of Affiant's investigation and information

received concerning the case through official channels, does hereby certify that a Warrant for Arrest

is outstanding for the arrest of said defendant. (See Attached - Warrant for Arrest and Criminal

Complaint and Affidavit).

Wherefore, Affiant prays that the defendant be dealt with according to law.

_____
Aaron Glass
Special Agent, United States Secret Service

Subscribed and Sworn to before me this
17th day of July, 2008.

_____
MORTON DENLOW
United States Magistrate Judge

Bond set [or recommended] by issuing Court at _____

1539820

AO 442 (Rev. 5/93) Warrant for Arrest

# United States District Court

**EASTERN** DISTRICT OF **VIRGINIA**

UNITED STATES OF AMERICA

V.

SUN LEE,

a/k/a Han Dong Park,

INFORMATION
WARRANT FOR ARREST
COPY ONLY
CASE NUMBER: 1:08 M 65 9

NOTICE: BEFORE ARREST, VALIDATE
THROUGH USDC ORIGINAL
HELD BY U.S. MARSHAL

Defendant.

To: The United States Marshal
    and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest        **Sun Lee, a/k/a Han Dong Park**

<u>                                                                                          </u>
Name

and bring him or her forthwith to the nearest magistrate judge to answer a(n)

☐ Indictment   ☐ Information   ☒ Complaint   ☐ Order of court   ☐ Violation Notice   ☐ Probation Violation Petition

charging him or her with (brief description of offense)

Conspiracy to forge a passport

in violation of Title    18              United States Code, Section(s)      371 and 1543

| | |
|---|---|
| Barry R. Poretz | U.S. Magistrate Judge |
| Name of Issuing Officer | Title of Issuing Officer |
| | July 11 2008,  Alexandria, VA |
| Signature of Issuing Officer | Date and Location |

Bail fixed at $ _____

By _____        _____
Name of Judicial Officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at |

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

AO 91 (Rev. 5/85) Criminal Complaint



# United States District Court

**EASTERN**     **DISTRICT OF**     **VIRGINIA**

FILED
JUL 11 2008
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

**v.**

IN CHUL LEE, a/k/a Xiping Yao

JOUNG HEE KIM, a/k/a Christina

SUN LEE, a/k/a Han Dong Park

## CRIMINAL COMPLAINT

CASE NUMBER: **1:08MJ 551**

### UNDER SEAL PURSUANT TO
### E-GOVERNMENT ACT OF 2002

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. On or about __October 4, 2007, continuing through on or about November 30, 2007__ in

__Fairfax County__ . in the __Eastern__ District of __Virginia__ defendant did, (Track Statutory Language of Offense)

**unlawfully, knowingly and intentionally conspire to falsely make, forge, counterfeit, mutilate, or alter any passport or instrument purporting to be a passport, with intent that the same may be used, in violation of 18 U.S.C. § 1543, and did an act to effect the object of the conspiracy to wit: provided a photo-substituted passport in a false name on October 30, 2007,**

In violation of Title _____18_____ United States Code, Section(s) __371__ .

I further state that I am a __Special Agent__ and that this complaint is based on the following facts:
<br>Official Title

       **See Attached Affidavit**

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

**AUSA Beth N. Gibson**

Sworn to before me and subscribed in my presence,

Signature of Complainant
<br>Jeremy S. Witkowski
<br>**Special Agent**
<br>**Bureau of Alcohol, Tobacco,**
<br>**Firearms & Explosives**

_____July 11, 2008_____     at     __Alexandria, Virginia__

Date       Hon. Barry R. Poretz                    City and State
<br>         Barry R. Poretz

Name & Title of Judicial Officer                            Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 1:08MJ *551* |
| | ) |
| IN CHUL LEE, | ) |
|    a.k.a. Xiping Yao, | ) |
| | ) **UNDER SEAL E-GOVERNMENT ACT** |
| JOUNG HEE KIM, | ) |
|    a.k.a. Christina, | ) |
| | ) |
| SUN LEE, | ) |
|    a.k.a. Han Dong Park, | ) |
| | ) |
| | ) |
|       Defendants. | ) |

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Jeremy S. Witkowski, being duly sworn, state as follows:

## I. INTRODUCTION

### A.  General

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives (ATF) and have been so employed since February of 2001.  I am a graduate of the

Federal Law Enforcement Training Center (FLETC) and the ATF National Academy.  In

addition, I have attended Alcohol and Tobacco Diversion training.  As an ATF Special Agent, I

have participated in firearms, narcotics, and tobacco investigations.  I have participated in the

execution of numerous federal, state and local search warrants.

2.      The ATF has investigated this case jointly with the Fairfax County Office of the
Sheriff and Police Department.  Special Agents with the Department of Labor, Social Security
Administration (SSA), Immigration and Customs Enforcement (ICE), Federal Bureau of
Investigation, Department of State, Postal Service, Internal Revenue Service, and Illinois
Secretary of State also assisted in the investigation.  Those agencies have provided the most
significant assistance in the investigation of the aspects of the case involving identification fraud
and identity theft.

3.      This affidavit contains information necessary to support a finding of probable
cause and is based on my personal observations during the course of this investigation,
information conveyed to me by other law enforcement officials, and my review of records,
documents, and other physical evidence obtained during this investigation.  This affidavit does
not include each and every fact observed by me or known to the government.

4.      This affidavit is presented in support of the following:

(1)      arrest warrants and a criminal complaint charging JUNG HO CHO, a.k.a. Young
Sik Kwon, SU YOUNG JANG, and CHUN BONG PARK with conspiracy to transport, receive,
possess, sell, distribute, and purchase contraband cigarettes, in violation of 18 U.S.C. §§ 371 and
2342(a);

(2)      an arrest warrant and a criminal complaint charging DONG YOUNG SHIN, a.k.a.
Dereck, with identification document fraud, in violation of 18 U.S.C. §§ 1028(a)(3), (b)(1)(B),
and (c)(1);

(3)     arrest warrants and a criminal complaint charging MYUNG IL CHANG, a.k.a.

Michael Chang, and YANG MAN YOON with conspiracy to commit money laundering, in

violation of 18 U.S.C. §§ 1956(a)(1)(B)(I), (a)(3)(B), and (h);

(4)     arrest warrants and a criminal complaint charging IN CHUL LEE, a.k.a. Xiping

Yao, JOUNG HEE KIM, a.k.a. Christina, and SUN LEE, a.k.a. Han Dong Park, with conspiracy

to commit passport fraud, in violation of 18 U.S.C. §§ 371 and 1543;

(5)     an arrest warrant and a criminal complaint charging PAUL KOOKWON PARK,

a.k.a. Chun Xian Tong, with conspiracy to commit Social Security fraud, in violation of 18

U.S.C. § 371 and 42 U.S.C. § 408(a)(7)(B);

(6)     an arrest warrant and a criminal complaint charging JONG SUNG CHAE, a.k.a.

Fuying Zhu, with conspiracy to commit Social Security fraud, in violation of 18 U.S.C. § 371

and 42 U.S.C. § 408(a)(7)(B);

(7)     an arrest warrant and a criminal complaint charging YOUNG WOO LOH, a.k.a.

Yingshu Han, with conspiracy to commit Social Security fraud, in violation of 18 U.S.C. § 371

and 42 U.S.C. § 408(a)(7)(B);

(8)     an arrest warrant and a criminal complaint charging YUNG SOO KIM, a.k.a.

Feng Ying Li, with Social Security fraud, in violation of 42 U.S.C. § 408(a)(7)(B); and

(9)     arrest warrants and a criminal complaint charging JAE WON KIM and JINNIE

MOON, a.k.a. Xianhua Sun, with conspiracy to commit Social Security fraud, in violation of 18

U.S.C. § 371 and 42 U.S.C. § 408(a)(7)(B).

### B.  Summary of the Law and Case

5.      Pursuant to 18 U.S.C. § 2341(2), the phrase "contraband cigarettes" refers to more than 10,000 cigarettes which bear no evidence of the payment of applicable state or local taxes.  I know from my work on this and other cigarette trafficking investigations that the majority of domestic brands of cigarettes are packaged as "master cases" that contain 60 cartons of cigarettes.  Each carton contains 10 packs, each filled with 20 cigarettes.  Thus, a carton of cigarettes contains 200 cigarettes, and 50 cartons contain 10,000 cigarettes—the number significant for purposes of the statutory definition of "contraband cigarettes."  This affidavit generally will refer to the quantity of cartons of cigarettes.

6.      Based on my training and experience, I also know that the evidence of payment of required cigarette taxes in New York, New Jersey, and Virginia is a stamp placed on the bottom of each pack of cigarettes.  As of January 2008, tax stamps in New York State cost $2.75 per stamp, with an additional tax of $1.50 in New York City; in New Jersey tax stamps cost $2.57; and in Virginia tax stamps cost $0.30 per stamp, with an additional $0.50 tax in Fairfax County. In my training and experience, trafficking in contraband cigarettes is lucrative as the criminals avoid paying taxes and pocket the portion of the sale that otherwise would have gone to the state or locality.  Such trafficking is most lucrative in places where taxes are highest, such as New York City, where a substantial portion of the cost of a pack of cigarettes covers the state and local taxes—amounting to $4.25 in taxes for a pack sold in New York City.  Thus, a person who deals in contraband cigarettes earns the dealer approximately an extra $4.25 per pack, $42.50 for each carton, and $2,550 for each case of contraband cigarettes sold in New York City.

7.    In sum, this investigation has revealed a conspiracy to transport, receive, possess, sell, distribute and purchase "contraband cigarettes" within the Eastern District of Virginia and elsewhere.  During the course of this investigation, the conspirators have purchased more than 300,000 cartons of untaxed, unstamped, contraband cigarettes.  Those defendants purchased untaxed, unstamped, contraband cigarettes from undercover law enforcement agents and/or detectives, hereinafter referred to as UC-1, UC-2 UC-3, UC-6, UC-7, and UC-8.  In total, the conspirators paid more than $4,000,000 for the contraband cigarettes during the course of the investigation.  The time frame for the investigation was extended due to the discovery of additional crimes.

8.    The investigation also uncovered money laundering schemes and a sophisticated scheme of identification fraud and identity theft.  The money laundering will be described later.  The identification fraud scheme centers on Social Security numbers and cards issued in the Commonwealth of the Northern Mariana Islands (including the island of Saipan) generally to citizens of China.  Those numbers begin with "586" (hereinafter "586 number" or "586 card").  The 586 numbers and cards, generally issued to Chinese nationals, then have been transferred to Koreans, who have used the Chinese national's name and 586 number.  Some have used the name on fraudulent, photo-substituted passports and then used the other person's 586 number, 586 card, and a photo-substituted passport to obtain a genuine driver's license in the false identity from the Illinois Department of Motor Vehicles (DMV).  As will be described below, some of the targets involved in the contraband cigarette trafficking also are involved in the identification fraud and identity theft.  The fraud appears to be motivated in some instances by immigration issues and in other instances by the desire to engage in financial frauds.

5

9.    A confidential informant (hereinafter CI) assisted my colleagues and I during this investigation. The CI has been convicted of a fraud-related offense and has admitted that, since that conviction, he/she again engaged in fraud. Aware of the credibility issues, I have taken a variety of steps to corroborate information from the CI. The vast majority of the CI's interactions with the targets, whether in person or by telephone, were recorded. Therefore, in many instances, I have had the recordings translated and have read the transcripts to corroborate the CI's general summaries of his/her interactions. In addition, I have corroborated information from the CI through surveillance and documentary evidence including, but not limited to, DMV records. The CI was more involved in assisting with the identification fraud aspect of the investigation, as opposed to the contraband cigarette aspect.

## II.  PROBABLE CAUSE

### A.  Unlawful Contraband Cigarette Transactions

#### *1.  CHO and SHIN:  Contraband Cigarette Trafficking*

10.    In sum, between March 22, 2007, and July 5, 2007, undercover agents traveled at the request of CHO and SHIN from Virginia to New York to deliver untaxed, unstamped cigarettes to CHO, SHIN, and their associates in New York. In total, CHO, SHIN, and their associates paid approximately $3,346,810 in exchange for approximately 190,180 cartons of untaxed, unstamped contraband cigarettes. CHO and SHIN coordinated the deliveries to New York during interactions with the undercover agents in the Eastern District of Virginia. Some of the specific deals are described below. None of the packs of cigarettes referred to in this affidavit contained any tax stamp for any locality or state. All dollar amounts are approximate.

6

11.     On March 13, 2007, in Annandale, Virginia, UC-1 and UC-2 met with CHO, who stated that his "big brother" in New York wanted cigarettes and requested 2,400 cartons of cigarettes.  CHO gave UC-2 $2,000 in cash as a deposit.  The plan was made for UC-1 and UC-2 to deliver the cigarettes to New York on two days, March 22, 2007, and March 27, 2007.

12.     On March 22, 2007, at CHO's direction, UC-1 and UC-2 delivered the 12,090 cartons of contraband cigarettes to a location in Queens, New York, in exchange for $217,080.  During the deal, CHO told UC-1 and UC-2 that his associates had people driving around the neighborhood to look for police.

13.     On March 23, 2007, UC-1 and UC-2 met with CHO in Annandale to discuss the delivery of the remainder of the cigarettes that CHO had ordered on March 13, 2007.  CHO asked if UC-1 and UC-2 could remove the cartons of cigarettes from the cases and place them in black trash bags to conceal the cigarettes.  UC-1 and UC-2 declined, saying it would take too long and make it harder to load the truck.  CHO then inquired whether, if the money were paid to UC-1 and UC-2 at the beginning of the deal, his associates could drive the UC's truck(s) to the location where they would unload the cigarettes.  The UC's agreed to that proposal.

14.     On March 27, 2007, UC-1 and UC-2 met with CHO and an individual, who identified himself as "Dereck," in Queens, New York.  Dereck has been identified as DONG YOUNG SHIN.  SHIN told UC-1 and UC-2 that he was CHO's business partner and translator. CHO directed UC-1 to get into a Mercedes Benz, where CHO handed UC-1 a black, plastic bag containing $202,100.  CHO's associates took the truck carrying 11,610 cartons of untaxed, unstamped cigarettes and returned it empty.

7

15.     On April 26, 2007, UC-1 and UC-2 met CHO, SHIN, and others in Flushing, New

York and delivered 30,000 cartons of contraband cigarettes in exchange for $529,960. SHIN

asked if the cigarettes were on pallets and shrink-wrapped in black plastic, as they had been for a

prior deal. When UC-1 and UC-2 indicated the cigarettes were not shrink-wrapped in black

plastic, an associate of CHO and SHIN expressed concern that, because of the truck's size, they

could not back into the opening to the warehouse and people thus would be able to see what they

were unloading from the truck. SHIN stated that "they" were nervous because of the size of the

transaction.

16.     On May 31, 2007, UC-1, UC-2, and UC-5 met CHO, SHIN, and one of their

associates in Queens, New York. CHO's associate told UC-2 that he could provide the UC's

with counterfeit cigarette tax stamps, counterfeit cellular telephones, and counterfeit watches.

CHO's associate provided UC-2 with a sample of approximately 56 counterfeit Virginia and 56

counterfeit Kentucky tax stamps. UC-2 asked for approximately 50,000 more counterfeit tax

stamps. CHO's associate said he would give the stamps to SHIN so SHIN could take the stamps

back to Virginia and deliver them to UC-2. Also on that day, CHO gave $599,400 to UC-1 in

exchange for 33,300 cartons of untaxed, unstamped cigarettes. On June 8, 2007, in Annandale,

Virginia, SHIN delivered 48,000 counterfeit Virginia tax stamps to UC-1 and UC-2. In

exchange, UC-2 gave SHIN $7,200.

17.     On June 18, 2007, UC-1 and UC-2 met with CHO and SHIN in Annandale, where

they discussed the purchase of additional counterfeit cigarette tax stamps. At the conclusion of

the meeting, SHIN asked UC-2 about obtaining a Walther PPK pistol for SHIN. UC-2 told

SHIN he would look around for such a pistol. SHIN said he wanted a "clean" gun. On June 20,

8

2007, during a contraband cigarette transaction in New York, SHIN again asked UC-1 and UC-2 about getting a firearm. Criminal history checks reveal that on or about July 17, 1998, SHIN was convicted of a felony, namely distribution of a controlled drug in violation of Virginia Code 18.2-248, in Fairfax County.

### 2. CHO, JANG, and PARK: Contraband Cigarette Trafficking

18.     My investigation has revealed that, between September 21, 2007, and the present CHO, SU YOUNG JANG, and CHUN BONG PARK conspired to purchase and purchased more than 95,000 untaxed, unstamped cartons of contraband cigarettes and paid more than $1,700,000 for those contraband cigarettes. Some of the deals are described below.

19.     On September 21, 2007, at a restaurant in Annandale, Virginia, UC-2 and UC-6 met with CHO, who said that he and SHIN had parted ways. CHO said he had a new associate who was interested in purchasing 13 cases (780 cartons) of Newport cigarettes. UC-2 said the cost for those would be $14,040. CHO agreed to that amount and placed a call from his cellular phone. CHO then suggested that they go to another parking lot to complete the deal. UC-2, UC-3, UC-6, CHO, and two of CHO's associates, one of whom has been positively identified as SU YOUNG JANG, gathered again at a parking lot. CHO handed UC-6 a large bundle of money for the 780 cartons of contraband cigarettes which were then loaded by SU YOUNG JANG and another of CHO's associates into a white 2000 Chevrolet box truck with Maryland license plate number 41J-857 (hereinafter Box Truck 41J-857).

20.     Maryland records show Box Truck 41J-857 is registered to J.S. Wholesale in Laurel, Maryland at an address shared by a person I believe to be a relative of SU YOUNG

JANG because, according to a Special Agent with ICE who performed records checks, their parents have the same names.

21.      On October 11, 2007, UC-1 and UC-2 met with CHO and JANG in the parking lot of a restaurant in Annandale, Virginia. During the transaction, CHO and JANG carried large, black plastic trash bags from the trunk of a 2004 black Mercedes Benz S500 with Virginia license plate number KJT-1150 to the back of Box Truck 41J-857. DMV records show that the 2004 Mercedes Benz with Virginia license plate number KJT-1150 is registered to CHO (hereinafter CHO's Mercedes Benz KJT-1150). In addition, CHO gave UC-2 a bag containing $54,000, which was also taken out of CHO's Mercedes Benz KJT-1150. JANG, with assistance from UC-1 and UC-2, transferred approximately 2,940 cartons of untaxed, unstamped contraband cigarettes to Box Truck 41J-857.

22.      On December 20, 2007, UC-1 and UC-2 met with CHO and JANG in a parking lot of a restaurant in Annandale. CHO handed UC-2 a list for 77 cases (4,620 cartons) of cigarettes. UC-1, UC-2, and CHO then went over to Box Truck 41J-857 to talk to JANG, who was seated in the driver's seat. UC-1 and UC-2 observed an apparent disagreement between CHO and JANG about whether JANG had worked out a deal to pay the UC's for the cigarettes on a later date. UC-1 and UC-2 told CHO they needed to be paid that evening. CHO then began yelling at JANG. CHO directed UC-1 to enter his Mercedes Benz KJT-1150. CHO lowered the retractable arm rest located in the middle of the back seat. This arm rest had a storage area inside in which UC-1 saw a large amount of cash. CHO then proceeded to count out $44,900, which he gave to UC-1. The 2,220 cartons were loaded into Box Truck 41J-857.

10

23.     On February 19, 2008, UC-1 and UC-2 met with CHO and JANG at the Public Storage facility at 4400 Backlick Road in Annandale. UC-1 and CHO went to CHO's Mercedes Benz KJT-1150, where CHO handed UC-1 a bag containing $140,000. The 7,740 cartons were loaded into Box Truck 41J-857 by the UC's and JANG. Following the deal, a surveillance team observed Box Truck 41J-857 travel to 7369 McWhorter Place in Annandale. A person resembling SU YOUNG JANG was seen exiting Box Truck 41J-857 and entering 7369 McWhorter Place.

24.     On March 5, 2008, UC-1, UC-2, and UC-3 met with CHO and JANG at the Public Storage facility at 4400 Backlick Road, in Annandale. UC-1 and CHO went to CHO's Mercedes Benz KJT-1150, parked nearby, where CHO handed UC-1 a bag containing $139,800. The 8,460 cartons were loaded into Box Truck 41J-857 by JANG and the UC's. JANG asked for an extra 10 cases (600 cartons) of Newport cigarettes. After the cigarettes were loaded, my colleague and I surveilled Box Truck 41J-857 drive from the storage area to a restaurant nearby, where a dark colored van with Maryland license plate number 26T875 backed up to Box Truck 41J-857. My colleague saw boxes being moved from Box Truck 41J-857 into the back of the dark colored van. DMV records show that the dark colored van with Maryland license plate number *26T875* is registered to *CHUN BONG PARK*.

25.     On March 11, 2008, UC-1, UC-2, UC-3, and UC-6 met with CHO and JANG at the Public Storage facility at 4400 Backlick Road, in Annandale. JANG drove Box Truck 41J-857 to a specific unit, where UC-2, UC-3, and UC-6 helped JANG load 8,401 cartons of untaxed, unstamped cigarettes into Box Truck 41J-857. UC-1 and CHO went to CHO's Mercedes Benz KJT-1150. JANG and the UC's determined that not all of the cigarettes would

11

fit into Box Truck 41J-857.  JANG called an unknown person.  UC-2 advised me that JANG

used the phone to arrange for someone to come to the storage area to pick up the Newport

cigarettes.  Approximately 10 minutes later, the previously mentioned dark colored van with

Maryland license plate number 26T875 and registered to CHUN BONG PARK, arrived at the

storage area.  Through DMV photos, the driver has been positively identified as CHUN BONG

PARK.  PARK loaded the remaining cigarettes into his vehicle.

      26.    On June 11, 2008, UC-1 and UC-2 met with CHO and JANG at a storage facility

in Alexandria.  When the UC's arrived, CHO was standing in front of his Mercedes Benz KJT-

1150.  JANG was sitting in the brown panel van registered to CHUN BONG PARK with

Maryland license plate number 26T875.  Once at a specific storage unit, JANG stated he wanted

20 cases (1,200 cartons).  UC-2 told JANG he only had 6 cases (360 cartons).  With assistance,

JANG loaded the untaxed, unstamped cigarettes into PARK's brown panel van.  During the

transfer, JANG stated he would deliver the cigarettes and then return with approximately 150

counterfeit Ed Hardy brand t-shirts.  UC-2 told JANG he would pay $2,500 for the items.  JANG

said he would return in 15 minutes and departed the area in CHUN BONG PARK's brown panel

van.  At this time, CHO handed UC-1 a bag which was retrieved from CHO's vehicle prior to

entering the storage unit.  The bag contained what appeared to be a large sum of U.S. currency.

CHO removed bundles of cash totaling $153,480 and handed it to UC-1.  UC-1 and UC-2

awaited the return of JANG.

      27.    On June 11, 2008, JANG returned to the storage facility in Alexandria, driving

Box Truck 41J-857, although he had left in CHUN BONG PARK's brown panel van.  JANG

opened the back of the box truck and removed 3 large boxes containing what appeared to be Ed

Hardy brand t-shirts. JANG stated he threw in additional samples of what appeared to be Blac

Label t-shirts. After the transfer of the t-shirts, approximately 8,460 cartons of contraband

cigarettes were loaded into the Box Truck 41J-857. UC-2 then showed JANG cases of untaxed

cigars and asked if JANG had a market for them. JANG told UC-2 that his brother owned a store

and could move the cigars. JANG also asked UC-2 about the cost of the cigars. UC-2 told

JANG that he would have to call him later with that information.

28.    On June 26, 2008, my colleague observed CHO and JANG exit Ravensworth

Towers Apartments. JANG was seen entering the driver's side of Box Truck 41J-857. CHO was

seen carrying a white and red bag. Before getting into the black Mercedes Benz KJT-1150, CHO

placed the white and red bag into the trunk. Shortly thereafter, JANG and CHO met with UC-1

and UC-2 at a public storage area in Fairfax County. During the meeting, approximately 9,000

cartons were transferred from the UC's custody into the back of Box Truck 41J 857. In

exchange, CHO handed UC-1 approximately $162,000 in cash from a white and red bag that

CHO retrieved from the trunk of the black Mercedes Benz KJT-1150. Following the deal, JANG

and CHO were seen traveling in their respective vehicles to the storage facility at 4400 Backlick

Road, where prior deals had occurred. My colleagues conducted surveillance and concluded that

CHO and JANG were not at the storage facility for a long enough time to unload the cartons in

the back of Box Truck 41J-857. CHO and JANG then were seen leaving that storage area and

traveling in their vehicles to 7369 McWhorter Place in Annandale, and entering #411.

## B. Money Laundering by CHO, CHANG, and YOON

29.    *On December 4, 2007, during a cigarette transaction, CHO discussed with UC-1*

and UC-2 several money laundering schemes that could help UC-1 and UC-2 legitimize some of

13

the money made from the cigarette sales. CHO explained that UC-1 and UC-2 could give CHO money which he would then deposit into his corporation's bank account. CHO stated that he would wait 60 to 90 days and then issue a cashier's check from his corporation's account to UC-1 and UC-2. CHO showed UC-1 and UC-2 a Wachovia credit card bearing the names Doochang America, Inc. and JUNG CHO. CHO also discussed that several people "pool" their money, buy a shopping center using a single buyer, and borrow against the property. CHO told UC-1 and UC-2 that, if they wanted help cleaning money, he would explain in further detail with an associate who spoke better English.

30.     On January 10, 2008, UC-1, UC-2, UC-6, UC-7, and UC-8 met with CHO and a person identified by law enforcement as MYUNG IL CHANG, a.k.a. Michael Chang, at a restaurant in Annandale. CHANG explained that CHO had told him that the UC's were interested in laundering money. UC-1 and UC-2 said they had made significant money by selling contraband cigarettes but, until the money was "cleaned," the money was not easy to spend. CHANG explained a scenario in which UC-1 and UC-2 would give CHANG and CHO $1,000,000 or $2,000,000 and CHANG through international connections would have the funds laundered and returned to UC-1 and UC-2 in the form of a cashier's check. CHANG said the fee for laundering the money would be 3%. When asked, CHANG stated that he could start with a smaller amount such as $100,000 or $200,000. CHO said $50,000 could be possible. Later that night, CHANG said CHO had made CHANG aware of CHO's business dealings with UC-1 and UC-2. CHANG indicated that, as CHO had vouched for UC-1 and UC-2's trustworthiness, CHANG was willing to guide CHO in laundering money for UC-1 and UC-2.

14

31.    On February 11, 2008, UC-1 and UC-2 met with CHO, CHANG, and YANG MAN YOON at a restaurant in Annandale. Prior to YOON's arrival, CHANG informed UC-1 and UC-2 that "the guy" coming was his real estate partner with ties to a construction company and check cashing business. Shortly after YOON's arrival, UC-1 provided YOON with $50,000 and a blank invoice. The $50,000 was the proceeds of a previous sale of untaxed, unstamped contraband cigarettes to CHO. YOON left within a half hour of receiving the $50,000 and CHANG explained that YOON had another meeting to attend. Later that evening, CHANG discussed several other schemes to launder money, most of which involved moving the money through Korean banks and/or Korean businesses. CHANG described that UC-1 and UC-2 could give CHANG cash which he would then use to obtain a cashier's check. CHANG explained he could take the cashier's check to Korea, where the money would be deposited into the account of a Korean business or individual and then be wired to a bank chosen by UC-1 and UC-2 or into one of CHANG's accounts, if that was preferable.

32.    On February 12, 2008, UC-1 and UC-2 met with CHO, CHANG, and YOON at a restaurant in Annandale. CHANG advised that the guy with checks was running late. While waiting, CHANG and YOON both continued to place calls in an attempt to get in touch with this unknown individual. Eventually, YOON decided to go meet this unknown individual. CHO advised that YOON was going to meet this individual at a grocery store. UC-1 observed YOON leave the restaurant parking lot driving an SUV with Virginia license plate number JXK 9338. According to the Virginia DMV, this license plate number is registered to YANG MAN YOON. When YOON returned to the restaurant, YOON handed UC-1 six personal checks that totaled

15

$50,000. The personal checks listed the payor as a person with the initials "W.G.K." All six checks cleared the bank.

33.     On March 26, 2008, rather than collecting $100,000 from CHO that CHO owed for a cigarette transaction, UC-2 allowed CHO to keep the $100,000 and to "launder" the money. CHO had advised UC-2 that he could assist in laundering $100,000 in exchange for a $10,000 fee. During the meeting on March 26, 2008, CHO gave UC-2 two checks—numbered 1273 and 1274—both written for $50,000. Both of the checks identified the payor as Champion Investment Realty, Inc., with an address in Alexandria, Virginia. Check #1273 was post-dated for April 3, 2008, and check #1274 was post-dated for April 10, 2008. The memo line on both checks reads "contract release return." CHO assured the funds would be available by the dates written on the checks.

34.     Check #1273 was deposited into an account and cleared on April 4, 2008. Check #1274 was also deposited on April 4, 2008, but was returned due to insufficient funds on April 15, 2008. The check was resubmitted on the same day and returned on April 18, 2008, again for insufficient funds.

35.     On April 23, 2008, UC-2 met with CHO at the Public Storage at 4400 Backlick Road, in Annandale, regarding the insufficient funds. CHO presented UC-2 with two cashier's checks. The first check, check #4803017538 from SunTrust Bank, was in the amount of $35,000 and identified the remitter as YANG MAN YOON. The second check, cashier's check #1304062303 from Wachovia Bank, was in the amount of $15,000 and identified the remitter as MYUNG IL CHANG. Both checks were issued on April 23, 2008. CHO apologized for the bounced check and said that both of the new checks could be deposited immediately.

16

36.     I obtained and reviewed records from Wachovia Bank related to CHANG's money market account.  The record shows a counter withdrawal of $15,000 on April 23, 2008—the same day the Wachovia Bank issued a cashier's check for $15,000 identifying CHANG as the remitter and the same day CHO provided a $15,000 Wachovia cashier's check listing CHANG as the remitter.  Records from Wachovia show that the $15,000 cashier's check was purchased on April 23, 2008, with funds withdrawn from a Wachovia account number ending in 4878 held in the name Myung Il Chang at branch number 6566, located at the Annandale-John Marr Financial Center, 4260 John Marr Drive, Annandale, Virginia, within the Eastern District of Virginia.

### C.  Identification Fraud

#### 1.  Identification Document Fraud by JUNG HO CHO

37.     On or about April 9, 2008, I received a phone call from the CI, who explained that he/she received a phone call from CHO about using the CI as a work reference.  The CI explained that CHO was trying to obtain a residential loan through the CI's acquaintance, who told the CI that CHO was trying to use an Illinois driver's license in the name "Young Kwon." The CI also told me that DONG YOUNG SHIN told the CI that SHIN had helped CHO build credit in CHO's fake name.

38.     On or about April 9, 2008, I gave the name of "Young Kwon" and a photograph of CHO to a representative of the Office of the Illinois Secretary of State to see if the person in the photograph was in their database.  That representative then provided me with a photograph in the name of "Young Sik Kwon."  The person in that photograph appears to be CHO.  I also obtained and reviewed the Illinois driver's license application in the name Young Sik Kwon,

17

listing a Social Security number of 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. A Special Agent with the SSA Office of

Inspector General (OIG) queried that 586 number. The query revealed that the SSA issued that

number in Saipan to a male named Young Sik Kwon who was born in Seoul, Korea—and not to

a male named JUNG HO CHO. I have reviewed a credit report and bank records that show the

same residence in Fairfax County is listed for both CHO and Young Sik Kwon.

### 2. Identification Document Fraud by DONG YOUNG SHIN

39.    This investigation has revealed that DONG YOUNG SHIN, a.k.a. Dereck, has

access to and sells real people's Social Security cards to other people. In particular, on August

21, 2007, UC-1 and UC-2 met with DONG YOUNG SHIN at a restaurant in Fairfax County,

Virginia, where SHIN handed UC-1 a white envelope containing five Social Security cards and a

photocopy of a Chinese passport in the name of "Jianhua Liu." UC-1 then gave SHIN an

envelope containing $8,200 in U.S. currency, amounting to $1,500 per Social Security card plus

a 10% commission. SHIN stated that he intended to wire the money for the Social Security cards

to New York on the following day in two separate transactions from two different bank accounts.

40.    The five Social Security cards carried the following names and numbers:

(1) Jinshan JIN, 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; (2) Hualan YAN, 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; (3) Yujuan ZHANG,

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; (4) Xianlan ZHANG, 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; and (5) Jianhua LIU, 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. I requested

that a Special Agent from the SSA OIG check those names and numbers in SSA databases.

Database checks revealed that those five numbers all had been issued to the people whose names

appear on the cards. I have been advised that 18 U.S.C. § 1028(a)(3) states it is unlawful to

knowingly possess with intent to transfer unlawfully five or more identification documents (other

than those issued lawfully for the use of the possessor). None of the five numbers were issued by the SSA to SHIN.

### 3. Identification Fraud by IN CHUL LEE, JOUNG HEE KIM, and SUN LEE

41.    In sum, this investigation has uncovered a conspiracy between IN CHUL LEE, a.k.a. Xiping Yao, JOUNG HEE KIM, a.k.a. Christina, and SUN LEE, a.k.a. Han Dong Park, to produce a false passport. The passport was to be used to secure the issuance of a genuine Illinois driver's license for a person in another person's name and using that other person's Social Security number. The conspirators charged money for the scheme.

42.    On October 4, 2007, IN CHUL LEE approached the CI about the purchase of false identities. IN CHUL LEE informed the CI that he had obtained three false identifications and that he would sell one or more of the false identifications to the CI. On or about October 16, 2007, the CI met with IN CHUL LEE and gave IN CHUL LEE two passport photos for use on the false identification documents. On or about October 18, 2007, the CI arranged to meet with IN CHUL LEE on the following day to pay IN CHUL LEE $2,500 for one Social Security card and one passport, with the intent of obtaining a genuine Illinois driver's license in a false name.

43.    On October 19, 2007, the CI met with IN CHUL LEE at a drug store in Annandale. My colleagues and I followed the CI to that location. My colleagues observed a silver Mercedes Benz with Maryland license plate number 9DLE38 arrive. Records checks show that license plate number is registered to IN CHUL LEE. During the meeting, the CI paid IN CHUL LEE a total of $2,500 consisting of two U.S. Postal Service Money Orders (serial numbers 11323920104 and 11323920115) each in the amount of $1,000 and an additional $500 in cash. According to the CI, during the meeting IN CHUL LEE advised the CI about the details

of the trip to Illinois to fraudulently obtain an Illinois driver's license in the false name. IN

CHUL LEE said that he had a contact in Chicago who would meet the CI at the airport and assist

the CI through the process of obtaining an Illinois driver's license. The CI told IN CHUL LEE

that he/she did not need IN CHUL LEE's contact to pick him/her up from the airport because

he/she had a friend in Chicago who could give him/her a ride. According to the CI, IN CHUL

LEE stated that in the following week he would give the CI a contact name and phone number.

44.    On or about October 22, 2007, IN CHUL LEE told the CI that the CI would need

to either provide his/her own fake passport or pay an additional $500 so that IN CHUL LEE's

contact could create a fake passport for the CI. Later that same day, the CI paid an additional

$500 to IN CHUL LEE to cover the cost of a passport.

45.    According to the CI, on or about October 25, 2007, IN CHUL LEE told the CI that

the contact in Illinois would be "Mr. LEE." IN CHUL LEE told the CI that, when the CI spoke

to Mr. LEE, the CI should tell Mr. LEE that "CHRISTINA" had referred him/her. IN CHUL

LEE told the CI to meet Mr. LEE at an address in Niles, Illinois, to obtain the false

documentation for the driver's license. IN CHUL LEE further explained that the CI then would

go to the Illinois DMV in Niles, Illinois. IN CHUL LEE told the CI that he would call Mr. LEE

to confirm everything.

46.    On October 29, 2007, the CI called me and explained that IN CHUL LEE had

given him/her a DMV study guide and one Social Security card in the name "LiMei Wang" with

the number 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. Record checks reveal that the Social Security card was in fact issued

to a person with the name "LiMei Wang." The CI's name is not "LiMei Wang" and the CI used

his/her real name—and not the name "LiMei Wang" when he/she interacted with IN CHUL LEE.

IN CHUL LEE told the CI that a female by the name of CHRISTINA had paperwork for the CI.

Law enforcement has positively identified CHRISTINA as JOUNG HEE KIM. The CI was told

to hand that paperwork to Mr. LEE in Illinois. IN CHUL LEE told the CI to contact

CHRISTINA by phone. The CI called CHRISTINA and arranged a meeting.

      47.    On October 29, 2007, CHRISTINA met with the CI in Fairfax County and gave

the CI an envelope with Korean writing on it. CHRISTINA told the CI that Mr. LEE (from

Niles, Illinois) would need the envelope. CHRISTINA wrote a phone number on the envelope

and said the CI could use the number to contact Mr. LEE. On October 29, 2007, my colleague

and I opened the envelope, which contained a DMV brochure entitled "A Different Kind of

Crash Course" and two passport photos that were identical to the passport photos the CI gave to

IN CHUL LEE on October 16, 2007. The contents were placed back into the envelope.

      48.    On or about October 29, 2007, Mr. LEE called the CI and told the CI that the

meeting location had changed to a specific location on West Golf Road, Niles, Illinois. On

October 30, 2007, the CI called Mr. LEE and said that he/she was at a rental car facility and

would meet Mr. LEE at the arranged location at approximately 11:00 a.m. The CI took the

envelope that CHRISTINA had given to him/her and the Social Security card that IN CHUL LEE

had given to him/her. The CI and Mr. LEE met in a parking lot on West Golf Road, Niles,

Illinois. Mr. LEE arrived in a silver Lincoln with Illinois license plate number G140099. The CI

spoke with Mr. LEE in Korean. The CI gave Mr. LEE the envelope that was provided by

CHRISTINA. The CI and Mr. LEE arranged to meet at 1:00 p.m. at the same parking lot.

21

Records checks of license plate number G140099 show that vehicle is registered to SUN LEE. A

DMV photograph of SUN LEE matches the person who drove that vehicle to meet with the CI.

49.     On October 30, 2007, the CI called SUN LEE, who told the CI that the passport

was complete and that SUN LEE would meet the CI in approximately 10 to 15 minutes. The CI

then returned to the parking lot on West Golf Road. SUN LEE pulled up to the CI's vehicle, got

into the passenger side of the CI's vehicle, and spoke with the CI in Korean. According to the

CI, SUN LEE gave the CI a Korean passport with the CI's passport photograph affixed to it and

listing the name "LiMei Wang"—the same name listed on the Social Security card that IN CHUL

LEE gave to the CI on or about October 29, 2007. SUN LEE also gave the CI an envelope to

present at the DMV as proof of Illinois residence. The envelope was postmarked in California

and addressed to "LiMei Wang" at an address in "Schaumburg, Illinois."

50.     An examination of the Korean passport that SUN LEE gave the CI revealed that,

underneath the photograph of the CI was the photograph of a female with a name other than

"LiMei Wang." The name listed for the female had initials "H.K." Records check show that

"H.K." now is a U.S. citizen.

51.     Following the exchange of documents in the parking lot, the CI traveled to the

DMV as directed by SUN LEE. SUN LEE told the CI that he was not going to the DMV with

the CI because he had to take another person to a different DMV. The CI did not go through

with the procedures to obtain a genuine Illinois driver's license in the false name. When SUN

LEE and the CI spoke later on October 30, 2007, the CI told SUN LEE that he/she had not

obtained the driver's license because the Social Security verification database was "down" but

he/she would return to try later. On October 31, 2007, SUN LEE and the CI spoke again. At my

direction, the CI provided a false story to SUN LEE to explain why the CI would not be returning

the Korean passport and Social Security card to SUN LEE. The CI told SUN LEE that he/she

had presented the passport and Social Security card to a clerk at the DMV and was told to have a

seat and, while waiting, became nervous and left the DMV without retrieving the passport and

Social Security card from the clerk. SUN LEE told the CI that he/she needed to get the passport

and Social Security card back from the DMV or they both would be in trouble. SUN LEE said

other clients needed those documents.

     52.     On November 5, 2007, the CI called SUN LEE and told SUN LEE that he/she had

asked the DMV to mail the passport and Social Security card to the address printed on the proof

of residence that SUN LEE had provided to the CI. SUN LEE expressed anger that the CI had

not consulted SUN LEE before asking the DMV to return the passport and Social Security card

to the address provided on the false proof of residence. SUN LEE said that he was concerned

because the Social Security card CHRISTINA provided to the CI was cheap and not as good as

his Social Security cards. SUN LEE told the CI that CHRISTINA pays low prices for her Social

Security cards. SUN LEE bragged that his Social Security cards are of a better quality, which is

why he charges more for his Social Security cards. SUN LEE stated that, if the CI could get the

Korean passport back from the DMV, SUN LEE would guarantee that the CI would get a driver's

license because his product was better.

     53.     On November 14, 2007, the CI called CHRISTINA and complained that he/she

had lost approximately $3,000 on the venture, including airfare to Chicago, and said he/she

wanted his/her money back. CHRISTINA told the CI that SUN LEE owed her approximately

$10,000 and was not answering her phone calls. CHRISTINA said she could not return the CI's

money. CHRISTINA told the CI "you know we have a huge problem because of you. As I explained to Mr. LEE, you know we lost the passport, we lost the social number, we now lost everything." CHRISTINA further stated "actually, there was no profit from the deal. I did it for you without any margin for me." The CI told CHRISTINA that SUN LEE had commented on the poor quality of CHRISTINA's Social Security cards and said that CHRISTINA was using the CI as a test case. The CI and CHRISTINA tried to make a three-way call to SUN LEE but could not get SUN LEE on the line. The CI asked CHRISTINA if she would compensate his/her loss if the CI was able to get the passport and Social Security card back. CHRISTINA replied "of course, so please find them for me." "Return them to my hand." "The passport too, I will add the plane fee to that."

54.    On November 30, 2007, the CI placed a monitored and recorded three-way call to CHRISTINA and SUN LEE. When all three were on the phone, CHRISTINA and SUN LEE told the CI that, if the CI could get the passport and the Social Security card back, they would return the CI's money. In addition, during the call CHRISTINA confronted SUN LEE about SUN LEE's comments about the quality of her fake Social Security cards.

### 4. Identification Fraud by SUN LEE

55.    A representative from the Illinois Secretary of State advised me that SUN LEE might be using the alias of Han Dong Park. I have obtained a photograph from an Illinois driver's license in the name of Han Dong Park. I compared that photograph to the Illinois driver's license in the name of SUN LEE. They appear to be of the same person. The CI also reviewed the photograph of SUN LEE and indicated that the photograph was of the person he/she met with in Illinois. Furthermore, records show that, during a driving test on September 11,

24

2007, a person using the name Han Dong Park drove a vehicle with Illinois license plate number

G140099—a license plate number registered to SUN LEE.

### 5. Identification Fraud by IN CHUL LEE

56.    As previously mentioned in October and November 2007, IN CHUL LEE assisted

the CI in obtaining a false passport and Social Security card.  On January 29, 2008, IN CHUL

LEE met with the CI and showed the CI an Illinois driver's license in the name of Xiping Yao

and asked the CI to run a credit report.  The CI told me that IN CHUL LEE said he had obtained

the driver's license (in the name Xiping Yao) the day before and commented about how easy it

had been.

57.    I compared the photograph from the Illinois driver's license issued in the name of

Xiping Yao.  I also obtained a photograph of driver's licenses issued by Texas and Maryland in

the name of IN CHUL LEE.  The photographs are of the same person.  I obtained a copy of the

Illinois driver's license application for Xiping Yao which listed a 586 number—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.  In

addition, I noted that the license in the name Xiping Yao and containing IN CHUL LEE's

photograph was issued on January 28, 2008, the day before his meeting with the CI.

58.    A Special Agent with the SSA OIG queried that 586 Social Security number and

determined that the SSA issued that number to a female named Xiping Yao who was born in

China in 1968—and not to a male named IN CHUL LEE.

### 6. Identification Fraud by PAUL KOOKWON PARK

59.    In an effort to identify IN CHUL LEE's other "customers" who had obtained

Illinois driver's licenses in fake names and using 586 numbers, at the request of investigators, the

CI called IN CHUL LEE on April 16, 2008, and told IN CHUL LEE that the CI had a contact at

the Virginia DMV who helped the CI obtain a Virginia driver's license in a fake name. The CI said that the CI's contact at the Virginia DMV could help IN CHUL LEE and IN CHUL LEE's other customers. IN CHUL LEE told the CI he would bring five to seven customers.

60.      On May 21, 2008, the CI met with IN CHUL LEE and a Korean male in Annandale. The Korean male identified himself as PAUL PARK. During the meeting, PAUL PARK completed an application for a Virginia driver's license in the name "Chun Xian Tong" and with an address of 7325 Lamar Drive, Springfield, Virginia. PAUL PARK also provided the CI with a copy of a Social Security card with the number 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 and the name Chun Xian Tong and a copy of an Illinois driver's license in the name Chun Xian Tong. PAUL PARK indicated he planned to tell others about the opportunity to obtain a Virginia driver's license in a false name. PARK also said that, for $4,000, he could help the CI build credit in the CI's false identity. PARK said he charged $4,000 to help people obtain three credit card histories on their credit reports. IN CHUL LEE told the CI that PAUL PARK worked for a mortgage company.

61.      A Special Agent with the SSA OIG queried the 586 number used by the male who identified himself as PAUL PARK. That query revealed that the 586 number was issued in Saipan to a female named Chunxian Tong who was born in China in 1970—and not to a male named PAUL PARK.

### 7. Identification Fraud by JONG SUNG CHAE

62.      Also on May 21, 2008, the CI met with IN CHUL LEE and a Korean male, who did not identify himself other than saying he worked at a dry cleaning business. During the meeting, the male completed an application for a Virginia driver's license in the name "Fuying Zhu," with an address of 4172 Lord Culpeper Lane, Fairfax, Virginia. The male provided the CI

with a copy of a Social Security card with the number 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 and the name Fuying Zhu
and a copy of an Illinois driver's license in the name Fuying Zhu, and bearing his photograph.
Following this meeting, I used Autotrack to determine the names of people who were associated
with the address the male listed on the driver's license application. The results of that query
included the name JONG CHAE. I obtained a Virginia driver's license photograph of JONG
CHAE. That Virginia driver's license photo matches the person shown in the Illinois driver's
license of Fuying Zhu and the person who appeared at the meeting on May 21, 2008. In addition,
Virginia Employment Commission (VEC) records for JONG CHAE identify him as the president
of a dry cleaning business. As stated, JONG CHAE told the CI that he owned a dry cleaning
business.

      63.     A Special Agent with the SSA OIG queried the 586 number used by JONG
CHAE. That query revealed that the 586 number was issued in Guam to a female born in China
in 1970—and not to a male named JONG CHAE. I also obtained an application for a Social
Security number in the name of JONG CHAE, listing Seoul, South Korea as his place of birth.

### 8. Identification Fraud by YOUNG WOO LOH

      64.     On May 28, 2008, the CI arrived at a location in Fairfax County, Virginia and
found a package under the door. The CI called PAUL PARK, who stated that one of his friends
was unable to meet with the CI in person and thus instead dropped off a package. The package
contained a copy of an Illinois driver's license in the name of "Yingshu Han" and a Social
Security card in the same name with number 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. The Illinois driver's license was
issued on April 24, 2008. The packet also contained an application for a Virginia driver's license
listing the name Yingshu Han and an address of 4677 Carisbrooke Lane in Fairfax, Virginia. The

packet also included a Chevy Chase bank account statement in the name Ying Shu Han at 4677
Carisbrooke Lane in Fairfax.

65.     I queried DMV records and found a Virginia license issued to a male born in 1974
with the name YOUNG LOH.  The photograph of YOUNG LOH in the Virginia DMV databases
matches that of the person shown on the Illinois driver's license in the name of Yingshu Han that
was provided to the CI.  With the assistance of the Postal Inspector, I have connected YOUNG
LOH to the address that PAUL PARK (using the name "Chun Xian Tong") listed on his
application for Virginia driver's license—7325 Lamar Drive, Springfield, Virginia.  I also
queried AutoTrack XP, which indicates that LOH owns that property.  In addition, I identified
another connection between YOUNG LOH and PAUL PARK, namely that the Illinois driver's
licenses in what I believe to their aliases (Yingshu Han and Chun Xian Tong) were issued in
Schaumburg, Illinois on the same day, April 24, 2008.

66.     A Special Agent with the SSA OIG queried the 586 number used in the
paperwork dropped off under the CI's door.  The query revealed that the 586 number was issued
in Saipan to a female named Yingshu Han born in China in 1975—and not to a male named
YOUNG LOH.  Through the SSA, I obtained an application for a Social Security number in the
name of YOUNG LOH.  That application shows that YOUNG LOH was born in Seoul, Korea
and presented a South Korean passport.

### 9. Identification Fraud by YUNG SOO KIM

67.     On or about February 20, 2008, I received a phone call from the CI, who
explained that he/she had recently received a phone call from YUNG SOO KIM.  YUNG SOO
KIM asked the CI to run the credit on YUNG SOO KIM's fake identity.  YUNG SOO KIM gave

the CI the name of Feng Ying Li and a specific Social Security number beginning in 586 with an address in Chicago, Illinois. YUNG SOO KIM also provided the CI with an Illinois driver's license number. The CI told me that YUNG SOO KIM said YUNG SOO KIM planned on getting approximately three more fake identities from Illinois. The CI was able to provide me with the VIN number (WDBNG84J95A458431) of YUNG SOO KIM's vehicle, which came back to a 2005 Mercedes Benz with Virginia license plate number JTK 2410. DMV records show that vehicle is registered to YUNG SOO KIM.

68.    On or about February 29, 2008, a Special Agent with the SSA OIG queried the 586 number used by YUNG SOO KIM. The query revealed that the 586 number was issued in Saipan to a female named Feng Ying Li who was born in China—and not to a male named YUNG SOO KIM, who according to his U.S. passport application was born in Seoul, Korea.

69.    I requested a copy of Feng Ying Li's Illinois driver's license photograph and application. I compared the Illinois driver's license photo associated with Feng Ying Li with the Virginia driver's license photo on file for YUNG SOO KIM. The individual in both of the driver's licenses appears to be the same person. According to Illinois records, the driver's license in the name Feng Ying Li and apparently carrying the photograph of YUNG SOO KIM was issued on February 14, 2008, and was issued as a result of an application listing that previously mentioned 586 number.

70.    On May 28, 2008, my colleague observed JUNG HO CHO drop off YUNG SOO KIM, who met with the CI in Fairfax County. During the meeting, KIM completed an application for a Virginia driver's license in the name of "Feng Ying Li," an address of 4201 Annandale Center Drive, Annandale. KIM provided the CI with a copy of a Social Security card

29

in the name Feng Ying Li, with the number 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, and a copy of an Illinois driver's license in the name Feng Ying Li bearing KIM's photograph.

### 10. Identification Fraud by JAE WON KIM and JINNIE MOON

71.     On November 30, 2007, the CI told me that an individual named JAE WON KIM recently approached the CI and said his friend needed help refinancing a vehicle. JAE WON KIM explained that his friend was planning to move from California to Virginia. JAE WON KIM said his friend was Xianhua Sun and provided a copy of Xianhua Sun's Illinois driver's license. I reviewed a copy of that license, issued on August 29, 2007, which lists a date of birth of March 6, 1976. JAE WON KIM conveyed to the CI that Xianhua Sun's Social Security number was 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 with an address of "249 S. LA Fayette Park # 302, L.A. CA, 90057." JAE WON KIM told the CI that the vehicle did not belong to Xianhua Sun. Instead, JAE WON KIM said the owner was JINNIE MOON, who resided in Virginia. JAE WON KIM gave the CI a copy of a vehicle registration for a white Lexus with Virginia license plate number JXZ 8846 in the name of JINNIE MOON. The CI told JAE WON KIM that the CI would need Xianhua Sun and JINNIE MOON to come in person to complete the transaction.

72.     On or about February 4, 2008, I asked the CI if he/she had further contact with JINNIE MOON or JAE WON KIM. The CI stated that he/she had received a copy of a California driver's license for JINNIE MOON. On or about February 5, 2008, I received a faxed copy of the California driver's license from the CI. I also requested and received California DMV records related to MOON, including her driver's license photograph. I compared the photograph of MOON with the photograph of Xianhua Sun on the Illinois driver's license. The photographs appear to be of the same person.

30

73.     In January of 2008, I received information from a Special Agent with the SSA OIG that Xianhua Sun's Social Security number, 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, was real and was issued in Saipan to Xianhua Sun—and not to JINNIE MOON.  A Special Agent with the SSA advised me of JINNIE MOON's Social Security number and indicated that MOON had provided a U.S. visa number purportedly related to an L-1 visa during an in-person interview to receive the Social Security card.  Special Agents with the Department of State and ICE queried the visa number MOON provided to SSA and were unable to find any validly issued visa with that number.  From an Autotrack query, I learned MOON was linked to the address of 249 S LA Fayette Park Place, #302 in Los Angeles, California.  Notably, that is the address JAE WON KIM provided to the CI as the address of Xianhua Sun.

74.     On or about April 3, 2008, the CI recorded a conversation between him/her and JAE WON KIM.  The CI mentioned to JAE WON KIM that he/she noticed during their past interactions that JAE WON KIM's friend, JINNIE MOON, had an Illinois driver's license in the name "Xianhua Sun."  JAE WON KIM explained that the reason JINNIE MOON obtained a fake Illinois driver's license was because her visa and California driver's license had expired.  JAE WON KIM explained that once her visa expired JINNIE MOON was not able to renew her California driver's license.

75.     According to a Postal Inspector, on or about May 29, 2008, temporary change of address forms were filed in the names JINNIE MOON and Xianhua Sun (believed to be JINNIE MOON), as well as in the name JAE WON KIM.

76.     A representative from the Illinois Secretary of State obtained DMV records at my request and advised me of a link between SUN LEE, mentioned earlier, and JINNIE MOON,

a.k.a. Xianhua Sun.  In particular, records show that on August 29, 2007, a person using the name Xianhua Sun took the driver's license exam using a 2001 Lincoln with Illinois license plate number G140099, registered to SUN LEE and discussed earlier in the context of the conspiracy between SUN LEE, IN CHUL LEE, and JOUNG HEE KIM, a.k.a. Christina.

## III. CONCLUSION

77.    Based upon the foregoing, there is probable cause to believe that from on or about September 21, 2007, and continuing through the present, in Fairfax County, Virginia, within the Eastern District of Virginia, and elsewhere, JUNG HO CHO, a.k.a. Young Sik Kwon, SU YOUNG JANG, and CHUN BONG PARK did unlawfully, knowingly, and intentionally conspire to transport, receive, possess, sell, distribute, and purchase "contraband cigarettes" as defined in 18 U.S.C. § 2341(2), and did an act to effect the object of the conspiracy to wit: purchase and possess untaxed, unstamped cigarettes on March 11, 2008, in violation of 18 U.S.C. §§ 371 and 2342(a).

78.    Based on the facts above, probable cause exists to believe that on or about August 21, 2007, in Fairfax County, Virginia, within the Eastern District of Virginia, DONG YOUNG SHIN, a.k.a. Dereck, did unlawfully and knowingly possess with intent to transfer unlawfully five or more identification documents (namely, Social Security cards and numbers) other than those issued lawfully for the possessor, in violation of 18 U.S.C. §§ 1028(a)(3), (b)(1)(B), and (c)(1).

79.    Based on the facts contained in this affidavit, I submit probable cause exists to believe that on or about December 4, 2007, and continuing through April 23, 2008, in Fairfax County, within the Eastern District of Virginia, MYUNG IL CHANG, a.k.a. Michael Chang, and

32

YANG MAN YOON did knowingly combine, conspire, and agree with each other, JUNG HO

CHO, and others known and unknown to commit money laundering, in violation of 18 U.S.C. §

1956(a)(1)(B)(I) and 1956(a)(3)(B), offenses against the United States, in violation of 18 U.S.C.

§ 1956(h).

80.      Based upon the foregoing, there is probable cause to believe that on or about

October 4, 2007, continuing through on or about November 30, 2007, in Fairfax County, within

the Eastern District of Virginia, and elsewhere, IN CHUL LEE, a.k.a. Xiping Yao, JOUNG HEE

KIM, a.k.a. Christina, and SUN LEE, a.k.a. Han Dong Park, did unlawfully, knowingly, and

intentionally conspire to falsely make, forge, counterfeit, mutilate, or alter any passport or

instrument purporting to be a passport, with intent that the same may be used, in violation of 18

U.S.C. § 1543, and did an act to effect the object of the conspiracy to wit:  provided a photo-

substituted passport in a false name on October 30, 2007, in violation of 18 U.S.C. § 371.

81.      Based upon the foregoing, there is probable cause to believe that on or about April

16, 2008, and continuing at least through on or about May 21, 2008, in Fairfax County, within

the Eastern District of Virginia, PAUL KOOKWON PARK, a.k.a. Chun Xian Tong, did

unlawfully and knowingly conspire with IN CHUL LEE and others known and unknown to

commit an offense against the United States, to wit:  Social Security fraud, in violation of 42

U.S.C. § 408(a)(7)(B),  and did an act to effect the object of the conspiracy, to wit:  listed another

person's Social Security number on an application for a Virginia driver's license and presented a

Social Security card listing that other person's name and number, in violation of 18 U.S.C. § 371.

82.      Based upon the foregoing, there is probable cause to believe that on or about April

16, 2008, and continuing at least through on or about May 21, 2008, in Fairfax County, within

the Eastern District of Virginia, JONG SUNG CHAE, a.k.a. Fuying Zhu, did unlawfully and

knowingly conspire with IN CHUL LEE and others known and unknown to commit an offense

against the United States, to wit:  Social Security fraud, in violation of 42 U.S.C. § 408(a)(7)(B),

and did an act to effect the object of the conspiracy, to wit:  listed another person's Social

Security number on an application for a Virginia driver's license and presented a Social Security

card listing that other person's name and number, in violation of 18 U.S.C. § 371.

83.    Based upon the foregoing, there is probable cause to believe that on or about April

16, 2008, and continuing at least through May 28, 2008, in Fairfax County, Virginia, within the

Eastern District of Virginia, YOUNG WOO LOH, a.k.a. Yingshu Han, did unlawfully and

knowingly conspire with PAUL KOOKWON PARK, IN CHUL LEE, and others known and

unknown to commit an offense against the United States, to wit:  Social Security fraud, in

violation of 42 U.S.C. § 408(a)(7)(B), and did an act to effect the object of the conspiracy, to wit:

listed another person's Social Security number on an application for a Virginia driver's license

and presented a Social Security card listing that other person's name and number, in violation of

18 U.S.C. § 371.

84.    Based upon the foregoing, there is probable cause to believe that on or about

February 14, 2008, and continuing at least through May 28, 2008, in Fairfax County, Virginia,

within the Eastern District of Virginia, and elsewhere, YUNG SOO KIM, a.k.a. Feng Ying Li,

for any purpose, did unlawfully and knowingly, with the intent to deceive, falsely represent a

number to be the Social Security account number assigned by the Commissioner of Social

Security to him, when in fact such number is not the Social Security account number assigned by

the Commissioner of Social Security to him, in violation of 42 U.S.C. § 408(a)(7)(B).

34

85.     Based upon the foregoing, there is probable cause to believe that on or about

August 29, 2007, and continuing at least through November 30, 2007, in Fairfax County,

Virginia, within the Eastern District of Virginia, and elsewhere, JAE WON KIM and JINNIE

MOON, a.k.a. Xianhua Sun, did unlawfully and knowingly conspire with each other, SUN LEE,

and with others known and unknown to commit an offense against the United States, to wit:

Social Security fraud, in violation of 42 U.S.C. § 408(a)(7)(B), and did an act to effect the object

of the conspiracy, to wit:  represented that the Social Security number of Xianhua Sun had been

issued to JINNIE MOON, in violation of 18 U.S.C. § 371.

Signature and Acknowledgment

_____

Jeremy S. Witkowski
Special Agent
Alcohol, Tobacco, Firearms, and Explosives


Subscribed and sworn before me on July 11, 2008, at Alexandria, Virginia,

_____

The Honorable Barry R. Poretz
United States Magistrate Judge

35